FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

APR 1 3 2015

MATTHEW J. DYKMAN
CLERK

CV-15-93 SCY/KK

CASE NUMBER: 1:15-CV-00093-SCY-KK #
Page 1
pg 2 →

# Study: TASER Shocks May Cause Fatal Heart Attacks

*by Matt Clarke*

A STUDY INVOLVING EIGHT PEOPLE WHO lost consciousness immediately after being shocked by a TASER X26 – the most common electronic control device (ECD) used by police, corrections agencies and the military – concluded that ECD shocks can induce fatal cardiac arrest by causing cardiac "capture" and ventricular tachycardia/ventricular fibrillation (VT/VF). Seven of the eight persons profiled in the study died while the eighth suffered memory impairment after receiving a near-fatal shock, according to an article published in *Circulation*, the journal of the American Heart Association.

The eight subjects of the peer-reviewed study were all male, ranging from 16 to 44 years old. Six were under the age of 25. All were struck in the chest with barbs from a TASER X26, a handgun-shaped weapon that fires the barbs with attached conductive wires using compressed nitrogen. The device delivers an initial 5,000-volt shock, followed by rapid micro-pulsing that is designed to mimic the electrical signals used by the brain to communicate with the muscles. The standard shock cycle lasts five seconds but can be shortened or repeated by the user.

The study found that a TASER shock "can cause cardiac electric capture and provoke cardiac arrest" resulting from an abnormal, rapid heart rate and uncontrolled, fluttering heart contractions. The journal article on the study's findings was authored by Dr. Douglas Zipes, with the Krannert Institute of Cardiology at Indiana University.

Scottsdale, Arizona-based TASER International, Inc., which manufactures the ECD devices, strongly defended its products. Company spokesman Steve Tuttle noted that with only eight subjects in the study, "broader conclusions shouldn't be drawn based on such a limited sample."

"There have been 3 million uses of TASER devices worldwide, with this case series reporting eight of concern," he added. "This article does not support a cause-effect association and fails to accurately evaluate the risks versus the benefits of the thousands of lives saved by police with TASER devices."

The company's website boasts that TASERs have saved nearly 125,000 lives, and that "Every Day TASER CEWs [Conducted Electrical Weapons] are Used **904** Times, Saving a Life from Potential Death or Serious Injury Every **30** Minutes." The site also quotes a Wake Forest University study which found that "in 1,201 cases, 99.75% [of] people subjected to a TASER CEW had no significant injuries."

Research published by *USA Today* in May 2012 indicated that the use of TASERs by police has saved lives because officers are less likely to kill someone using a TASER than by shooting them. The research also found that TASERs reduced the number of injuries suffered by police officers when apprehending suspects.

Tuttle questioned whether Dr. Zipes might have possible bias because he had testified as an expert witness in lawsuits against TASER. "There are key facts that contradict the role of the TASER device in all of these cited cases, and Dr. Zipes has conveniently omitted all facts that contradict his opinion," Tuttle said.

However, Amnesty International reported in February 2012 that more than 500 post-ECD-shock deaths occurred following TASER deployments between 2001 and 2008. Further, a report from a commission of inquiry into the death of a man at the Vancouver airport in Canada concluded there was evidence "that the electric current from a conducted energy weapon is capable of triggering ventricular capture ... and that the risk of ventricular fibrillation increases as the tips of the probes get closer to the walls of the heart."

Other studies, including a 2011 report by the ACLU of Arizona, have also identified problems with the use of TASERs by law enforcement agencies. [See: *PLN*, April 2012, p.26]. Prior to Dr. Zipes' research, though, no peer-reviewed study had concluded that ECD shocks can induce ventricular fibrillation leading to sudden cardiac arrest and death.

TASER published an eight-page warning in March 2013 that stated, "exposure in the chest area near the heart has a low probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death."

In November 2013, TASER submitted a statement to the U.S. Securities and Exchange Commission (SEC) indicating that the company would pay a total of $2.3 million in settlements in product liability lawsuits. The statement said the settlements were intended to end legal battles over TASER-related "suspect injury or death."

TASER also changed the warning labels on its ECD products. The company used to tout TASERs as delivering "non-lethal" shocks, but following several TASER-related deaths the language was changed in 2009 to read "less lethal." Company training manuals now state that "exposure in the chest area near the heart ... could lead to cardiac arrest."

The eight subjects in the study authored by Dr. Zipes were all clinically healthy. They were hit with one or both TASER barbs in the anterior chest wall near the heart, and all lost consciousness during or immediately after being shocked. In six cases, the first recorded heart rhythms were VT/VF. One had no heart rhythm, and in the eighth subject an external defibrillator reported a shockable rhythm but did not record it.

Two of the subjects had structural heart disease, two had elevated blood alcohol levels and two had both. The study concluded, however, that those conditions were considered unlikely to be the cause of the sudden loss of consciousness that occurred at the time or immediately after they received TASER shocks, although the conditions may have increased the likelihood of ECD-induced VT/VF.

The study also concluded it was unlikely that other known causes of in-custody death, such as "excited delirium" or restraint asphyxia, were factors in the deaths of seven of the eight subjects due to the proximity of the TASER shock to the loss of consciousness.

Dr. Zipes' research noted that studies in pigs, sheep and humans established that shocks across the chest from the TASER X26 and a new prototype ECD could cause cardiac capture. The pig studies also repeatedly showed that the TASER X26 could induce VT/VF at normal or higher-than-

# State of Washington Prison Phone Justice Campaign!

*Prison Phone Justice Project needs your help for statewide campaign!*

While much progress has been made in reducing the costs of long distance prison calls, we are still fighting to reduce the high costs of in-state prison and jail calls at the local level. In January 2014, the Human Rights Defense Center (HRDC), the parent organization of Prison Legal News, reopened its Seattle office to launch the Washington Prison Phone Justice Campaign.

This is our first statewide phone justice campaign, and we're excited to have people involved on both the local and national levels who are dedicated to ending the exorbitant phone rates and kickbacks associated with the prison phone industry. David Ganim, HRDC's national Prison Phone Justice Director, has already been obtaining the phone contracts and rates for all 39 county jails in Washington, as well as data from the Washington Department of Corrections.

We recently hired a local campaign director, Carrie Wilkinson, who will manage our office in Seattle and coordinate the statewide campaign. Washington prisoners and their families pay some of the highest phone rates in the nation, and we need your help to win this battle!

Here's how you can help – first, please visit the Washington campaign website:

## www.wappj.org

There you can see all the ways you can make a difference. The site allows you to sign up for the campaign and upload videos and share blog entries about how high prison phone rates make it difficult for you to stay in touch with your incarcerated loved ones. You can also upload an audio message, and even call in your story to 1-877-410-4863, toll-free 24 hours a day, seven days a week! We need to hear how you and your family have been affected by high prison phone rates. If you don't have Internet access, you can mail us a letter describing your experiences and we'll post it. Send letters to HRDC's main office at: **HRDC, Attn: WA Phone Justice Campaign, P.O. Box 1151, Lake Worth, FL 33460.** Washington state prisoners can mail us letters and send a copy of this notice to their family members so they can get involved.

By choosing to participate in the Washington Prison Phone Justice Campaign, you will be playing a key role in ending the unfair phone rates that prisoners' families have to pay. We cannot win this battle without your help, so please visit the campaign website and share your experiences! Donations are also welcome and greatly appreciated, and can be mailed to the above address or made online via the campaign site. Thank you for your support!

Page 2

normal outputs. Similar studies attempting to induce VT/VF by placing the barbs in the anterior chest and using strong, multiple and/or lengthy shocks could not be conducted on humans due to ethical considerations.

Of course, such considerations do not prevent police officers from using TASERs on suspects, or prison and jail guards from deploying TASERs against prisoners.

Sources: *"Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device," by Douglas P. Zipes, M.D. (May 2012); www.taser.com; USA Today, www.theverge.com*

## Texas Court Holds CCA is a "Governmental Body" for Purposes of Public Records Law <span>STOP</span>

ON MARCH 19, 2014, A STATE DISTRICT court in Travis County, Texas held that Corrections Corporation of America (CCA), the nation's largest for-profit prison company, is considered a "governmental body" for purposes of the state's Public Information Act and therefore subject to the Act's "obligations to disclose public information."

The court entered its ruling on a motion for summary judgment filed by Prison Legal News, which had brought suit against CCA in May 2013 after the company refused to produce records related to the now-closed Dawson State Jail in Dallas – including reports, investigations and audits regarding CCA's operation of the facility. [See: *PLN*, June 2013, p.46]. Such records would have been made public had the jail been operated by a government agency.

"This is one of the many failings of private prisons," said PLN managing editor Alex Friedmann. "By contracting with private companies, corrections officials interfere with the public's right to know what is happening in prisons and jails, even though the contracts are funded with taxpayer money. This lack of transparency contributes to abuses and misconduct by for-profit companies like CCA, which prefer secrecy over public accountability."

CCA currently operates nine facilities in Texas, including four that house state prisoners.

"The conditions of Texas prisons have been the focus of intense public scrutiny for nearly 40 years," stated Brian McGiverin, an attorney with the Texas Civil Rights Project. "Today's ruling is a victory for transparency and responsible government. Texans have a right to know what their government is doing, even when a private company is hired to do it."

In its summary judgment motion, PLN argued that CCA meets the definition of a governmental body under the state's Public Information Act, Section 552.003 of the Texas Government Code, because, among other factors, the company "shares a common purpose and objective to that of the government" and performs services "traditionally performed by governmental bodies."

In the latter regard, PLN noted that "Incarceration is inherently a power of government. By using public money to perform a public function, CCA is a governmental body for purposes" of the Public Information Act. CCA's argument to the contrary – that it is not a governmental body and therefore does not have to comply with public records requests – was rejected by the district court.

CCA had also argued that the taxpayer funds it receives from the State of Texas "are not necessarily used specifically for operating Texas facilities," and that such payments "are used generally to support CCA's corporate allocations throughout the United States."

PLN previously prevailed in a similar public records lawsuit against CCA in Tennessee, where the firm is headquartered; another records suit filed by PLN is pending against CCA in Vermont. The company has vigorously opposed lawsuits requiring it to comply with public records laws. [See: *PLN*, July 2013, p.42; June 2013, p.14].

"CCA and other private prison companies should not be able to hide behind closed corporate doors when they contract with government agencies to perform public services using taxpayer money," said PLN editor Paul Wright.

PLN was ably represented by attorneys Cindy Saiter Connolly with Scott, Douglass & McConnico, LLP and Brian McGiverin with the Texas Civil Rights Project. See: *Prison Legal News v. CCA*, Travis County District Court (TX), Cause No. D-1-GN-13-001445.



**Complete GED Preparation**
[Paperback]
Publisher: Steck-Vaughn; 2nd edition
*928 pages; $24.99; Item #: 1099*

Over 2,000 GED-style questions thoroughly prepare learners for test day. This single book offers thorough coverage of the revised GED Test with new test information, instruction, practice, and practice tests. Answer key included.

Order from: **Prison Legal News**
*(Add $6 shipping for orders under $50)*
**PO Box 1151
Lake Worth, FL 33460**
Phone: **(561) 360-2523**
**www.prisonlegalnews.org**



# Mass Incarceration: The Whole Pie
## A Prison Policy Initiative briefing

*by Peter Wagner and Leah Sakala*

Wait, does the United States have 1.4 million or more than 2 million people in prison? And do the 688,000 people released every year include those getting out of local jails? Frustrating questions like these abound because our systems of federal, state, local and other types of confinement – and the data collectors that keep track of them – are so fragmented. There is a lot of interesting and valuable research out there, but definitional issues and incompatibilities make it hard to get the big picture for both people new to criminal justice and for experienced policy wonks.

On the other hand, piecing together the available information offers some clarity. This briefing presents the first graphic we're aware of that aggregates the disparate systems of confinement in this country, which hold more than 2.4 million people in 1,719 state prisons, 102 federal prisons, 2,259 juvenile correctional facilities, 3,283 local jails and 79 Indian Country jails as well as in military prisons, immigration detention facilities, civil commitment centers and prisons in U.S. territories.[1]

While the numbers in each slice of this pie chart represent a snapshot cross section of our correctional system, the enormous churn in and out of confinement facilities underscores how naive it is to conceive of prisons as separate from the rest of our society. In addition to the 688,000 people released from prisons each year,[2] almost 12 million people cycle through local jails annually.[3] Jail churn is particularly high because at any given moment most of the 722,000 people in local jails have not been convicted and are incarcerated because they are either too poor to make bail and are being held before trial, or because they've just been arrested and will make bail in the next few hours or days. The remainder of the people in jail – almost 300,000 – are serving time for minor offenses, generally misdemeanors with sentences under a year.

So now that we have a sense of the bigger picture, a natural follow-up question might be something like: how many people are locked up in any kind of facility for a drug offense? While the data don't give us a complete answer, we do know that it's 237,000 people in state prison, 95,000 in federal prison and 5,000 in juvenile facilities, plus some unknowable portion of the population confined in military prisons, territorial prisons and local jails.

Offense figures for categories such as "drugs" carry an important caveat here, however: all cases are reported only under the most serious offense. For example, a person who is serving prison time for both murder and a drug offense would be reported only in the murder portion of the chart. This methodology exposes some disturbing facts, particularly about our juvenile justice system. For example, there are nearly 15,000 children behind bars whose "most serious offense" wasn't anything that most people would consider a crime. Almost 12,000 children are behind bars for "technical violations" of the requirements of their probation or parole, rather than for a new criminal offense, and more than 3,000 children are behind bars for "status" offenses, which are, as the U.S. Department of Justice explains, "behaviors that are not law violations for adults, such as running away, truancy, and incorrigibility."[4]

Turning finally to the people who are locked up because of immigration-related issues, more than 22,000 are in federal prison for criminal convictions of violating federal immigration laws. A separate 34,000 are technically not in the criminal justice system but rather are detained by U.S. Immigration and Customs Enforcement (ICE), undergoing the process of deportation, and are physically confined in immigration detention facilities or in one of hundreds of individual jails that contract with ICE.[5] (Notably, those two categories do not include the people represented in other pie slices who are in some early stage of the deportation process due to non-immigration-related criminal convictions).

Now that we can, for the first time, see the big picture of how many people are locked up in the United States in the various types of facilities, we can see that something needs to change. Looking at the big picture requires us to ask if it really makes sense to imprison 2.4 million people on any given day, giving us the dubious distinction of having the highest incarceration rate in the world. Both policy makers and the public have the responsibility to carefully consider each individual slice of the pie chart in turn, to ask whether legitimate social goals are served by putting each category behind bars and whether any benefit really outweighs the social and fiscal costs. We're



*Guadalupe County Correctional Facility*

Name: [signature] NMCD# [____] Unit [____]

Post Office Box 520
Santa Rosa, New Mexico 88435

**RECEIVED**
At Albuquerque NM

APR 19 2015

MATTHEW J. DYKMAN
CLERK

Office of the Clerk
Suite 270
333 Lomas Blvd, N.Mex
N.W. Albuquerque 87102

8710227470